**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **STEPHEN JASON HOULIHAN AND JOHN SAMPLE,** | § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | **Case No. 4:17-CV-00170-A** |
| **FTS INTERNATIONAL SERVICES, LLC,** | § § § | |
| **Defendant.** | § | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND BRIEF IN SUPPORT**

John B. Brown
Texas Bar No. 00793412
john.brown@ogletreedeakins.com
John M. Barcus
Texas Bar No. 24036185
john.barcus@ogletreedeakins.com
**OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.**
8117 Preston Road, Suite 500
Dallas, Texas  75225
Telephone: 214-987-3800
Facsimile:  214-987-3926

**ATTORNEYS FOR DEFENDANT
FTS INTERNATIONAL SERVICES, LLC**

## TABLE OF CONTENTS

I. NATURE OF THE CASE AND PROCEDURAL HISTORY ....................................................1

II. GROUNDS FOR THE MOTION AND SUMMARY OF ARGUMENT...................................2

III. SUMMARY JUDGMENT EVIDENCE ..................................................................................3

IV. FACTS.....................................................................................................................................3

    A.  FTSI Hires Houlihan.................................................................................................3

    B.  The Job Description ..................................................................................................4

    C.  Houlihan's Schedule and Reporting Structure.....................................................5

    D.  Houlihan's Day to Day Duties................................................................................7

    E.  Houlihan's Autonomy and Authority ....................................................................8

    F.  The Collective Action Waiver .................................................................................9

V. ARGUMENT AND AUTHORITY .........................................................................................10

    A.  Grounds for the Motion ........................................................................................10

    B.  Houlihan Waived His Right to Participate in a Collective Action .............................11

    C.  The Administrative Exemption Applied to Houlihan..............................................15

    D.  If FTSI is Found to have Misclassified Houlihan, the Fluctuating Workweek
        Method  Applies........................................................................................................18

VI.      CONCLUSION................................................................................................................21

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adkins v. Labor Ready, Inc.*,
303 F.3d 496 (4th Cir. 2002) ................................................................12

*Am. Express Co. v. Italian Colors Rest.*,
133 S.Ct. 2304 (2013) .........................................................................12

*AT&T Mobility LLC v. Concepcion*,
131 S.Ct. 1740 (2011) ..........................................................................12

*Barrentine v. Ark.-Best Freight Sys., Inc.*,
101 S.Ct. 1437 (1981) ..........................................................................12

*Birdsong v. AT&T Corp.*,
No. C12-6175, 2013 WL 1120783 (N.D. Cal. March 18, 2013) ...........................12

*Carter v. Countrywide Credit Indus., Inc.*,
362 F.3d 294 (5th Cir. 2004) ....................................................11, 12, 14

*Condo v. Sysco Corp.*,
1 F.3d 599 (7th Cir. 1993) ....................................................................20

*Copello v. Behringer Ingelheiim Pharm. Inc.*,
812 F.Supp.2d 886 (N.D. Cal. 2011) .......................................................12

*D.R. Horton v. N.L.R.B.*,
737 F.3d 344 (5th Cir. 2013) ...........................................................11, 12

*Dalheim v. KDFW-TV*,
918 F. 2d 1220 (5th Cir. 1990) ..............................................................16

*Delaney v. FTS International Services, LLC*,
No. 4:16-cv-662 (M.D. Pa. Jan. 20, 2017) ................................................14

*Dewan v. M-I, LLC*,
858 F.3d 331 (5th Cir. 2017) .................................................................16

*Evans v. Lowe's Home Centers, Inc.*,
No. 3:CV-03-0438, 2006 WL 1371073 (M.D. Pa. May 18, 2006) .......................20

*Flood v. New Hanover County*,
125 F.3d 249 (4th Cir. 1997) .................................................................20

*Garcia v. Yachting Promotions, Inc.*,
   No. 15-20776-Civ-Scola, 2015 WL 12533144 (S.D. Fla. Dec. 8, 2015) ...............................20

*Gilmer v. Interstate/Johnson Lane Corp.*,
   500 U.S. 20 (1991).................................................................................................................12

*Greg Garcia, et al. v. FTS International, Inc.*,
   No. 4:15-cv-963-Y .............................................................................................................3, 14

*In re Halliburton Co.*,
   80 S.W.3d 566 (Tex. 2002), *cert. denied*, 537 U.S. 1112 (2003)...........................................13

*Inimitable Group, L.P. v. Westwood Group Dev. II, Ltd.*,
   264 S.W.3d 892 (Tex. App.—Fort Worth 2008, no pet.).........................................................13

*Killion v. KeHe Distribs., LLC*,
   761 F.3d 574 (6th Cir. 2014) .................................................................................................14

*Mazurkiewicz v. Clayton Homes, Inc.*,
   971 F. Supp. 2d 682 (S.D. Tex. 2013) .............................................................................12, 13

*Mitchell v. Abercrombie & Fitch Co.*,
   428 F. Supp. 2d 725 (S.D. Ohio 2006), *aff'd*, 225 Fed. App'x 362 (6th Cir.
   2007) ...................................................................................................................................20

*In re Online Travel Co.*,
   953 F. Supp. 2d 713 (N.D. Tex. 2013) ..................................................................................12

*Overnight Motor Transp. Co. v. Missel*,
   316 U.S. 572 (1972)..............................................................................................................18

*Owen v. Bristol Care, Inc.*,
   702 F.3d 1050 (8th Cir. 2013) ...............................................................................................12

*Palmer v. Convergys Corp.*,
   Civ. No. 7:10-CV-145, 2012 WL 425256 (M.D. Ga. Feb. 9, 2012).......................................12

*Pasture Renovators, LLC v. Lawson Cattle & Equip., Inc.*,
   480 F. Supp. 2d 890 (W.D. Tex. 2006)...................................................................................13

*In re Poly-America, L.P.*,
   262 S.W.3d 337 (Tex. 2008)..................................................................................................13

*Ramos v. Telgian Corp.*,
   176 F. Supp. 3d 181, 195-196 (E.D.N.Y. 2016) .....................................................................20

*Seagull Energy E&P, Inc. v. Eland Energy, Inc.*,
   207 S.W.3d 342 (Tex. 2006)..................................................................................................13

*Serrano v. Globe Energy Service, LLC*,
   No. 15-cv-00170-RAJ, 2016 WL 7616716 (W.D. Tex. March 3, 2016)......................3, 11, 12

*Sutherland v. Ernst & Young LLP*,
   726 F.3d 290 (2nd Cir. 2013)...............................................................................................12

*Walthour v. Chipio Windshield Repair, LLC*,
   745 F.3d 1326 (11th Cir.), *cert. denied*, 134 S.Ct. 2886 (2014).............................................12

## Statutes

29 U.S.C. § 207(a)(1)...............................................................................................................18

29 U.S.C. § 213(a)(1)...............................................................................................................15

FLSA........................................................................................................................... *passim*

FLSA, section 216(b)................................................................................................................11

section of the FLSA, first..........................................................................................................18

## Other Authorities

29 C.F.R. 541.200(a)(1)-(3)......................................................................................................15

29 C.F.R. § 541.201(a).............................................................................................................16

29 C.F.R. § 541.202(a).............................................................................................................17

29 C.F.R. § 541.202(b)............................................................................................................17

29 C.F.R. § 541.202(c).............................................................................................................17

29 C.F.R. § 778.114(a).......................................................................................................19, 20

Rule 56....................................................................................................................................10

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **STEPHEN JASON HOULIHAN AND** | § | |
| **JOHN SAMPLE,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **Case No. 4:17-CV-00170-A** |
| **v.** | § | |
| | § | |
| **FTS INTERNATIONAL SERVICES, LLC,** | § | |
| | § | |
| **Defendant.** | § | |

### DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT
### AND BRIEF IN SUPPORT

Defendant FTS International Services, LLC ("FTSI") files this Motion for Partial Summary Judgment and Brief in Support ("Motion") and states:

### I.   NATURE OF THE CASE AND PROCEDURAL HISTORY

This is a straightforward FLSA misclassification dispute with a complex (and relevant) procedural history. Plaintiff Stephen Jason Houlihan ("Houlihan") filed his Complaint (doc. 1) on February 7, 2017, in the United States District Court for the Northern District of Texas, Dallas Division, alleging a single cause of action for unpaid overtime. Judge Kinkeade issued a *sua sponte* order transferring the case to this Court before FTSI's deadline to appear, and Houlihan and newly-added Plaintiff John Sample ("Sample") filed their First Amended Complaint (doc. 9) in this Court on March 1, 2017.

On March 8, 2017, Houlihan and Sample and another newly-added Plaintiff, Carl Lewis ("Lewis"), purported to file their Second Amended Complaint (doc. 10). The Court issued an order (doc. 11) the following day unfiling the Second Amended Complaint, both because Plaintiffs had failed to obtain FTSI's consent or leave of Court, and because Plaintiffs had not presented written consents to join in a collective action or any other indication that they intended

to pursue a collective action under the FLSA. FTSI thereafter filed its Answer to Plaintiffs' First Amended Complaint ("Answer") (doc. 12), which remains FTSI's live pleading. Plaintiffs thereafter filed a Motion for Leave to File Second Amended Complaint ("Motion for Leave") (doc. 15) and presented the Court with the written consents it earlier found lacking. FTSI opposed the Motion for Leave because Lewis had previously executed a collective action waiver.

Plaintiffs then filed an Unopposed Motion for Severance (doc. 19) asking the Court to sever the action into separate actions in which each Plaintiff would pursue his claims separately. The Court issued an order (doc. 21) denying the Unopposed Motion for Severance and noting that if Lewis wished to pursue his claims against FTSI, he would be free to bring a separate civil action. (He has.) Thus, the First Amended Complaint ("Complaint") is Plaintiffs' live pleading, and both Houlihan and Sample remain party plaintiffs. The parties have exchanged written discovery, and FTSI has deposed Houlihan. The case is set for trial on February 12, 2018.

## II.      GROUNDS FOR THE MOTION AND SUMMARY OF ARGUMENT

FTSI seeks and is entitled to summary judgment on Houlihan's claims for three independent reasons: *first*, Houlihan signed a collective action waiver in which he agreed to pursue any claims against FTSI on an individual basis; *second*, FTSI properly classified Houlihan as an exempt employee because he falls within the FLSA's administrative exemption; and *third*, in the event FTSI is found after a trial on the merits to have misclassified Houlihan, the fluctuating workweek method applies to determine any overtime compensation owed to him.

### III.     SUMMARY JUDGMENT EVIDENCE

FTSI has filed its Appendix in Support of Motion for Summary Judgment ("Appendix") contemporaneously herewith. The Appendix contains the following evidence and other materials:

| Exhibit | Description |
|---------|-------------|
| A | Excerpts from and Exhibits to the Deposition of Stephen Houlihan |
| B | September 1, 2016, Order Partially Granting Motion for Summary Judgment in *Garcia v. FTS International, Inc.* |
| C | January 20, 2017, Memorandum in *Delaney v. FTS Int'l Services, LLC* |
| D | January 20, 2017, Order in *Delaney v. FTS Int'l Services, LLC* |

FTSI incorporates the Appendix herein by reference for all purposes.

### IV.     FACTS

The following facts are undisputed.

### A.     FTSI Hires Houlihan

Fort Worth-based FTSI is an oil field services company providing well-completion services for oil and gas producing companies, including hydraulic fracturing or "fracing" services. Houlihan applied to work for FTSI in May 2011.[1] He interviewed with an FTSI supervisor and understood that if he obtained the position for which he had applied, he would be responsible for coordinating the delivery of sand used in the fracing process to FTSI's job sites in a timely manner.[2] He understood that the volume of sand used in FTSI's fracing operations was significant – millions of pounds each week – and that he would not be responsible coordinating other types of deliveries to the job sites.[3] FTSI thereafter offered Houlihan a job as a logistics

---

[1] App. 2 (Houlihan 18:12-18).
[2] App. 3 (Houlihan 21:5 - 23:22).
[3] App. 3 (Houlihan 23:23 – 24:25).

coordinator at an annual base salary of $55,000.[4]  Houlihan understood that it did not matter how many hours he worked; however many he worked, he would receive the same salary.[5]  He began work in June 2011.[6]  He remained employed by FTSI as a logistics coordinator until October 2016, performing essentially the same job duties the entire time.[7]

## B.    The Job Description

When he accepted employment with FTSI, Houlihan received and signed a job description identifying the logistics coordinator position as "FLSA class exempt" and setting forth the essential duties and responsibilities of his position.[8]  It would prove remarkably accurate.  For example, the position summary reads:

> Proactively ensures on-site inventory levels are maintained through the complete responsibility of coordinating the timely supply chain process flows, inventory management, freight analysis, invoice auditing, and quality service assurance.

Houlihan agrees that this is a fair description of the logistics coordinator position.[9]  The first listed essential duty and responsibility indicates that a logistics coordinator:

> Directly supervises and evaluates the performance of internal transportation providers and drivers[,] understand the scheduled load information (ET's, BOL/Ticket information) and any changes to their daily job/dispatch schedule that may occur.

Houlihan agrees that this was one of the duties and responsibilities he carried out as a logistics coordinator.[10]  Houlihan agrees that another of his essential duties was as follows:

---

[4] App. 4 (Houlihan 25:9 – 26:6.)  Houlihan uses the terms "dispatcher" and "logistics coordinator" interchangeably. In his mind, they mean the same thing. FTSI's term is "logistics coordinator." App. 4 (Houlihan 26:9 – 27:1).

[5] App. 5 (Houlihan 29:19 – 30:7).

[6] App. 4 (Houlihan 26:7-8).

[7] App. 4-5 (Houlihan 27:2 – 29:3). FTSI elected to pay Houlihan on an hourly rather than salaried basis beginning in March or April 2016. App. 4 (Houlihan 27:25 – 28:10).

[8] App. 18 and 24-26 (Houlihan 88:3-25 and Exh. 4). The job description references "Vertex Solutions, LLC" as Houlihan's employer. FTSI is the successor to Vertex. App. 18 (Houlihan 88:3-14).

[9] App. 19 and 24-26 (Houlihan 89:7-17 and Exh. 4).

[10] App. 19 (Houlihan 89:18 – 90:6 and Exh. 4).

> Coordinates accurate timely delivery of material through supervision of internal and external transportation providers. Works with customers to collect new job information including amount and type of product required; origin of product; stage information; job directions.[11]

Houlihan testified that another of his essential job duties was to "communicate[ ] with sand coordinators about job specific information (permits required, location access, et cetera). Conduct pre-job meetings and dispatch trucks accordingly."[12]  Finally, Houlihan confirmed the accuracy of the following as an essential job duty:

> Maintains constant communications with material recipients on site and the transportation providers (drivers). Communicates with sand coordinators to verify current job status (stage, pumping or not, location congestion, trucks staged, drag loads, scheduled loads and ETA's).[13]

Houlihan elaborated at length about his performance of these essential job duties during his employment with FTSI.

## C.   Houlihan's Schedule and Reporting Structure

Throughout his tenure with FTSI, Houlihan worked out of FTSI's Aledo, Texas, location.[14]  He reported to a lead logistics coordinator, who in turn reported the logistics manager for the entirety of FTSI.[15]  Although the individuals filling those jobs changed over time, Houlihan's reporting structure remained the same throughout Houlihan's employment.  FTSI's logistics group all worked out of Aledo, with one logistics manager, three lead logistics coordinators, and six logistics coordinators like himself.[16]  The sheer volume of business FTSI was doing during Houlihan's employment required it to have multiple lead logistics

---

[11] App. 19 (Houlihan 90:7-18 and Exh. 4).
[12] App. 19 (Houlihan 90:19 – 91:3 and Exh. 4).
[13] App. 19 and 24-26 (Houlihan 92:7-16 and Exh. 4).
[14] App. 5 (Houlihan 30:24 – 31:3).
[15] App. 5 (Houlihan 31:4-25).
[16] App. 5-6 (Houlihan 31:24 – 33:16).

coordinators, each responsible for a different geographic area or "district."[17]   Each logistics coordinator was assigned to only one lead logistics coordinator.[18]   Houlihan was assigned to several lead logistics coordinators – and thus had responsibility for several different districts – over time.[19]

The logistics department operated 24 hours a day.[20]   Logistics coordinators typically worked 12-hour shifts, either day shift or night shift, with shift changes coming at either 5:00 a.m./p.m. or 6:00 a.m./ p.m.[21]   When he began working for FTSI, Houlihan typically worked four 12-hour shifts per week; that changed after the first year to a 5/3 structure (*i.e.*, five shifts in one week followed by three the next week).[22]   The 5/3 structure remained in place from approximately the middle of 2012 until Houlihan's employment with FTSI ended.[23]

Houlihan worked out of an office in what is colloquially referred to as the Aledo "yard."[24]   One logistics coordinator for each district worked on each shift – that is, when Houlihan had responsibility for the South Texas district, he was the only logistics coordinator for that district on a given shift, and the shift also included logistics coordinators responsible for West Texas, Oklahoma/North Dakota, and East Texas.[25]   While a day shift might find as many as four *lead* logistics coordinators in the office, at night there usually was only one for the entire logistics group.[26]

---

[17] App. 6 (Houlihan 36:4-13).
[18] App. 6 (Houlihan 36:14-16).
[19] App. 7 (Houlihan 37:19 – 40:20).
[20] App. 8 (Houlihan 41:6-15).
[21] App. 8 (Houlihan 41:16 – 42:8).
[22] App. 8 (Houlihan 43:17 – 44:13).
[23] App. 9 (Houlihan 45:16-20).
[24] App. 9 (Houlihan 46:18 – 47:5).
[25] App. 9 (Houlihan 47:9 – 48:2).  After Houlihan's employment began, FTSI added a Pennsylvania district which also had its own logistics coordinator. App. 9-10 (Houlihan 48:3 – 49:1.)
[26] App. 10 (Houlihan 50:18 – 51:12).

site.[34]   FTSI typically performed multiple fracing "stages" on each job site during a shift.

Houlihan explained what he would need to tell the logistics coordinator coming on shift:

> If we have a well, for example, El Paso, we have three stages dispatched, each stage would consist of five trucks, we would have a total of 15 trucks currently running on this well, and you know, however many sand types, might be only one sand type, could be two, kind of give them that breakdown.

> Each stage might be the same or each stage could be different. Each stage might say, 'we need five loads of 100 mesh,' and the second stage of trucks, the other five, they might have 300 mesh and two loads of 40/70, so I would have to break that down specifically, which they would see on the doc. But I would, you know, relate that to him or her . . . and just basically show them the breakdown of what I had and how to turn trucks accordingly.[35]

Throughout a shift, Houlihan needed to monitor the amount of sand FTSI had in place on each

job site, what was being delivered, and what each job site might need in the next few hours, to

make sure FTSI's fracing crews did not run out of whatever they needed at the job site.[36]   He had

to keep up with FTSI's drivers' locations, and told the drivers where to deliver their loads and

when to pick up a fresh load and where and when to deliver it.[37]

## E.     Houlihan's Autonomy and Authority

Houlihan agrees that overall, there were "lots of moving pieces, and you're trying to

make sure that everything moves smoothly, and so the crew out at the well site has what it needs

to do its job."[38]   He was responsible for obtaining reports from FTSI's coordinators on the

various job sites regarding their immediate needs, and for monitoring the location of all of

FTSI's sand trucks operating in his division by telephone and by GPS to make sure that the right

amount of sand was being picked up and delivered to each job site.[39]   The GPS data was

---

[34] App. 12 (Houlihan 59:2-11).
[35] App. 12 (Houlihan 59:18 – 60:13).
[36] App. 12-13 (Houlihan 60:23 – 61:24).
[37] App. 13 (Houlihan 61:25 – 62:6).
[38] App. 13 (Houlihan 62:7-11).
[39] App. 13-14 (Houlihan 64:7 – 65:18).

### D.    Houlihan's Day to Day Duties

FTSI had up to three fracing jobs going on in each district at a given time.[27]  As the logistics coordinator, Houlihan was responsible for making sure that all of the job sites in his district had all of the sand that they needed, including making sure that FTSI had enough sand to fill each job site's needs, and that it was getting transported in a timely fashion to the various job sites.[28]  FTSI assigned FTSI-employed sand truck drivers to each district.[29]  The drivers used FTSI trucks and were required to maintain DOT log books to record their hours.[30]  Houlihan was responsible for making sure FTSI's drivers had not exceeded their DOT-mandated maximum hours for a week before dispatching them, though he admits that he simply asked the drivers about their hours and took their word for it, rather than doing his job by reviewing their logs.[31]  Houlihan remained inside the Aledo office throughout his shift, but was in communication with his drivers by telephone and with "sand coordinators" on each job site by telephone and email.[32]

Coordinating and dispatching sand was a complex operation. To understand it, Houlihan gave an example of the type of information he would need to receive from his counterpart upon a shift change:  which "wells we currently had running, how many drivers we had on each well, the status of each well and what we had dispatched at the time."[33]  He would need to know what *type* of sand his counterpart had dispatched to each job site (sometimes only one or two, sometimes between four and six types of sand), as well as the volume of sand dispatched to the

---

[27] App. 10 (Houlihan 52:3-5).
[28] App. 10 (Houlihan 52:6-14).
[29] App. 11 (Houlihan 53:18 – 54:5).
[30] App. 11 (Houlihan 54:6-10.)
[31] App. 11 (Houlihan 54:14 – 55:2).
[32] App. 11 (Houlihan 55:3 – 56:13).
[33] App. 12 (Houlihan 58:11 – 59:1).

available to him on a computer screen, and might reflect up to 35 trucks at a given time.[40]  He

compared it to flight control at an airport.[41]

When drivers arrived in Aledo to pick up their trucks, they called Houlihan to get their

assignments, either to go pick up sand immediately or to travel to a "dead head" or truck stop to

await further instructions.[42]  The drivers did not have authority to make those decisions on their

own.[43]  Houlihan communicated with every driver about every stage.[44]  If a truck broke down,

Houlihan had authority to pull a driver assigned to a well that had more than enough sand and

reassign him to make a delivery to another well to cover for the broken-down truck to keep sand

flowing to FTSI's job site.[45]  Houlihan had authority to move drivers around if one got sick, or if

the sand demands of a particular job site threatened to overwhelm the drivers assigned to that site

on a given day.[46]  Overall, Houlihan described his work environment as the logistics coordinator,

in terms of the volume of information that was coming in to him and that he was trying to

coordinate, as "very fast paced."[47]

## F.    The Collective Action Waiver

On August 3, 2015, Houlihan signed an Acknowledgment of Receipt of Employee

Handbook (the "Waiver"), in which he agreed to waive the procedural right to litigate

collectively or as part of a class against FTSI.[48]  The following language expressly limited his

right to bring or participate in a collective action under the FLSA:

---

[40] App. 14(Houlihan 65:19 – 67:17).
[41] App. 14 (Houlihan 67:18-23).
[42] App. 17 (Houlihan 82:2 – 83:15).
[43] App. 17 (Houlihan 83:16-18).
[44] App. 14-15 (Houlihan 68:21 – 71:18.)
[45] App. 15-16; 16 (Houlihan 72:16 – 73:13; 73:19 – 74:5).
[46] App. 16 (Houlihan 74:12-23).
[47] App. 20 (Houlihan 110:10-15).
[48] App. 21-22 and 27 (Houlihan 116:24 – 117:12 and Exh. 7).

## CLASS AND COLLECTIVE ACTION WAIVER

I agree that any proceeding to resolve or litigate any dispute, whether in court or otherwise, will be conducted solely on an individual basis, and that I will not seek to have any controversy, claim or dispute heard as a class action, a representative action, a collective action, a private attorney-general action, or in any proceeding in which I act or propose to act in a representative capacity. I further agree that no proceeding will be joined, consolidated, or combined with another proceeding, without the prior written consent of all parties to any such proceeding.[49]

The Waiver was conspicuous with **"CLASS AND COLLECTIVE ACTION WAIVER"** written in bold, capital letters.[50] Houlihan remained employed by FTSI for more than a year after electing to sign the Waiver.

## V.     ARGUMENT AND AUTHORITY

Based on the foregoing facts, the Court should grant the Motion for the following reasons:

### A.     Grounds for the Motion

FTSI presumes the Court is familiar with the standards for summary judgment under Rule 56 and will not repeat the same in detail herein. FTSI seeks partial summary judgment with regard to Houlihan's claims for three reasons: (1) the Waiver is enforceable as a matter of law and requires severance of his claims from this action; (2) Houlihan's testimony proves that FTSI properly applied the administrative exemption; and (3) to the extent FTSI is determined to have misclassified Houlihan, the fluctuating workweek method applies for purposes of determining his overtime compensation.

---

[49] *Id.*
[50] *Id.*

**B.    Houlihan Waived His Right to Participate in a Collective Action**

As the Court recognized in its Order unfiling the Second Amended Complaint, this is a collective action under the FLSA, section 216(b) of which states that "no employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which the action is brought." No such consents had been filed at the time the Court unfiled and struck the Second Amended Complaint. On April 11, 2017, Houlihan filed an instrument (doc. 17) titled "Consent to Become Party Plaintiff," in which he declared: "Pursuant to Section 216(b) of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA), and by my signature below, I hereby consent to the prosecution of claims under the FLSA on my behalf and in my name against FTS INTERNATIONAL SERVICES, LLC." Thus, Houlihan recognizes this as a collective action. The Court should grant the Motion and sever Houlihan's claims, because by electing to sign the Waiver, Houlihan waived the procedural right to litigate with others and promised to pursue any claim in an individual action.

**1.    The right to proceed collectively is procedural and waivable.**

It is well-settled in the Fifth Circuit that the right to bring FLSA claims as a class or collective action is a procedural right, not a substantive right. *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 301 (5th Cir. 2004) (rejecting the argument that the "inability to proceed collectively deprives [a plaintiff] of substantive rights under the FLSA"); *D.R. Horton v. N.L.R.B.*, 737 F.3d 344, 357 (5th Cir. 2013) (same); *Serrano v. Globe Energy Service, LLC*, No. 15-cv-00170-RAJ, 2016 WL 7616716 at *4-5 (W.D. Tex. March 3, 2016) (granting partial summary judgment and holding that employees may waive their ability to participate in collective-action litigation, as long as they retain the individual capacity to vindicate their rights). It is a procedural right because "a class action is not *itself* a remedy." *D.R. Horton*, 362

F.3d at 357.[51] Because the right to proceed collectively under the FLSA is a procedural right, it is subject to waiver. *See Barrentine v. Ark.-Best Freight Sys., Inc.*, 101 S.Ct. 1437, 1444-45 (1981) (holding that substantive rights under the FLSA are non-waivable); *see also Carter*, 362 F.3d at 301 (finding that arbitration agreement and class-action waiver were enforceable because they did not implicate a substantive right under the FLSA).

### 2.    Collective action waivers are enforceable.

The Supreme Court and district courts in Texas have all routinely enforced class and collective-action waivers. *See Am. Express Co. v. Italian Colors Rest.*, 133 S.Ct. 2304, 2310 (2013); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 32 (1991); *AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740, 1747-48 (2011)   (holding agreement that contained a class-action waiver was enforceable and did not violate public policy because the plaintiffs were still able to litigate their claims individually in arbitration); *In re Online Travel Co.*, 953 F. Supp. 2d 713, 718-19 (N.D. Tex. 2013) (upholding class-action waiver and agreement); *Mazurkiewicz v. Clayton Homes, Inc.*, 971 F. Supp. 2d 682, 692 (S.D. Tex. 2013); *Serrano*, 2017 WL 7616716, at *4-5 (relying on *D.R. Horton*, *supra*, and enforcing plaintiff's waiver of his procedural right to proceed in a collective action under the FLSA).

Whether or not the waiver is part of an arbitration agreement makes no difference. *Mazurkiewicz*, 971 F. Supp. 2d at 692; *Serrano*, 2017 WL 7616716, at *4-5 (expressly rejecting argument to the contrary).[52]   This is so because it "makes little sense that an arbitration

---

[51] The rule is the same in most other circuits. *See e.g., Walthour v. Chipio Windshield Repair, LLC*, 745 F.3d 1326, 1335 (11th Cir.), *cert. denied*, 134 S.Ct. 2886 (2014); *Sutherland v. Ernst & Young LLP*, 726 F.3d 290, 296-97 n.6 (2nd Cir. 2013); *Owen v. Bristol Care, Inc.*, 702 F.3d 1050, 1052–53, 1055 (8th Cir. 2013); *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 503 (4th Cir. 2002).

[52] *See, e.g., Birdsong v. AT&T Corp.*, No. C12-6175, 2013 WL 1120783, at *6 (N.D. Cal. March 18, 2013) (enforcing class-action waiver outside of the arbitration context); *Palmer v. Convergys Corp.*, Civ. No. 7:10-CV-145, 2012 WL 425256, at *2-3 (M.D. Ga. Feb. 9, 2012) (upholding class-action waiver divorced from any arbitration agreement because it was a contractual provision that did not affect a substantive right); *Copello*

---

agreement could take the more drastic step of entirely waiving a federal court forum, including the right to proceed collectively, but an employment contract could not waive the right to proceed collectively in court while preserving the right to bring the suit on an individual claim." *Mazurkiewicz*, 971 F. Supp. 2d at 692.

### 3.   The Waiver is an enforceable contract.

Under Texas law, for a contract to exist, there must be an offer, acceptance, and valid consideration. *Pasture Renovators, LLC v. Lawson Cattle & Equip., Inc.*, 480 F. Supp. 2d 890, 892-93 (W.D. Tex. 2006) (analyzing whether conversations between the parties constituted an oral contract). When interpreting a contract, the primary goal is to give effect to the intent of the parties expressed in the contract. *Seagull Energy E&P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006). A party to a contract is presumed to have read and understood its contents. *Inimitable Group, L.P. v. Westwood Group Dev. II, Ltd.*, 264 S.W.3d 892, 904 (Tex. App.—Fort Worth 2008, no pet.). Contracts are valid unless grounds exist at law or in equity for revocation of the agreement, and the heavy burden of proving such a ground falls on the party opposing the contract. *In re Poly-America, L.P.*, 262 S.W.3d 337, 348 (Tex. 2008). Here, not only did Houlihan accept this agreement by signing the Waiver, his knowledge of the policy combined with his decision to remain employed by FTSI after signing the Waiver is proof of his decision to accept the waiver. *See e.g., In re Halliburton Co.*, 80 S.W.3d 566, 569 (Tex. 2002), *cert. denied*, 537 U.S. 1112 (2003) (holding that continued employment after notice of terms and conditions of employment is acceptance of those terms and conditions).

---

*v. Behringer Ingelheiim Pharm. Inc.*, 812 F.Supp.2d 886, 897 (N.D. Cal. 2011) (enforcing collective-action waiver without an accompanying arbitration agreement).

**4.     The Court should follow the lead of others and enforce the Waiver.**

Judge Means has enforced FTSI's collective action waiver already. In particular, in a case styled *Greg Garcia, et al. v. FTS International, Inc.*, No. 4:15-cv-963-Y, four plaintiffs who worked for FTSI as service supervisors filed an FLSA misclassification suit on behalf of themselves and purportedly on behalf of all other service supervisors employed by FTSI. FTSI filed a motion for partial summary judgment (doc. 41 in the *Garcia* case) arguing that three of the named plaintiffs had signed collective action waivers, and asking the court to grant summary judgment on their collective-action claims.  Judge Means considered and expressly rejected the reasoning of the Sixth Circuit in *Killion v. KeHe Distribs., LLC*, 761 F.3d 574 (6th Cir. 2014), on which the three plaintiffs relied, and instead followed the Fifth Circuit's (binding) opinion in *Carter* and several other cases from within and outside this Circuit, all holding that the right to proceed collectively under the FLSA is a waivable procedural "right." A copy of Judge Means' Order (doc. 118 in the *Garcia* case) is included in the Appendix as Exhibit "B" for the Court's reference (App. 28-37). In January 2017, a court in the Middle District of Pennsylvania likewise enforced FTSI's waiver, holding that the right to litigate collectively is procedural rather than substantive, and finding FTSI's waiver to be "valid and enforceable." The court dismissed all class and collective action allegations.  The case is styled *Delaney v. FTS International Services, LLC*, No. 4:16-cv-662 (M.D. Pa. Jan. 20, 2017), and the court's Memorandum and Order granting partial summary judgment (doc. 40 and 41 in the *Delaney* case) are included in the Appendix as Exhibits "C" and "D" (App. 38-56 and App. 57).  The Court should follow the lead of those that have come before it, enforce the Waiver, grant the Motion, and sever Houlihan's claims into a separate action (as Judge Means did in *Garcia*).

C.     **The Administrative Exemption Applied to Houlihan**

Alternatively and in addition, the Court should grant summary judgment on Houlihan's

claim because FTSI properly classified him as exempt pursuant to the so-called "administrative

exemption." The FLSA's overtime rules do not apply to "employees employed in a bona fide

administrative capacity." 29 U.S.C. § 213(a)(1). That term means any employee:

(1)     compensated on a salary or fee basis of at least $455 per week;

(2)     "whose primary duty is the performance of office or non-manual work
        directly related to the management or general business operations of the
        employer or the employer's customers;" and

(3)     "whose primary duty includes the exercise of discretion and independent
        judgment with respect to matters of significance."

29 C.F.R. 541.200(a)(1)-(3). Houlihan earned an annual base salary of $55,000 – well over

$1,000 per week. Thus, the first element is undisputed. Houlihan's testimony proves the second

and third elements as a matter of law.

1.     **Houlihan's primary duty was directly related to the management or general
       business operations of FTSI and its customers.**

There should be no dispute that Houlihan's work constituted "*office or non-manual*

work." His work was entirely indoors at FTSI's Aledo facility. The tools of his trade were a

telephone and a computer. He did not work in a manufacturing plant or on a production line and

was not called on to perform physical or manual labor of any kind.

There likewise should be no dispute that Houlihan's work directly related to the

management or general business operations of FTSI and its customers. The Code of Federal

Regulations explains what that phrase means:

The phrase 'directly related to the management or general business operations'
refers to the type of work performed by the employee. To meet this requirement,
an employee must perform work directly related to *assisting with the running or
servicing of the business*, as distinguished, for example, from working on a

manufacturing production line or selling a product in a retail or service establishment.

29 C.F.R. § 541.201(a).

Whether the administrative exemption applies is a legal question, albeit one that ordinarily involves a fact-intensive analysis. *Dewan v. M-I, LLC*, 858 F.3d 331, 334-334 (5th Cir. 2017). Here, the facts are undisputed. FTSI relies *solely* on Houlihan's own testimony, in which he effectively admitted that he assisted with the running or servicing of FTSI's business operations. He was responsible on a daily basis for making sure that all of the jobs in his district had the sand they needed, and making sure that FTSI had enough sand to *supply* to those job sites. He was responsible for coordinating and overseeing the activities of FTSI's drivers to make sure that sand was transported to FTSI's customers' job sites in a timely manner. He was in constant communication with FTSI's drivers and its on-site sand coordinators. He gave drivers their assignments when they arrived in Aledo to pick up a truck, and he monitored those trucks – up to 35 at a time – by GPS on a screen akin to an air traffic control monitor. He had authority to move drivers around as needed.

He *admitted* that the job description he signed when he began working was accurate in describing his essential duties, including directly supervising and evaluating the performance of drivers and taking "complete responsibility" for "coordinating the timely supply chain process flows, inventory management, freight analysis, invoice auditing, and quality service assurance." He could hardly have had a *more* direct hand in assisting with the running of FTSI's business operations. He was involved in the "administrative operations of [FTSI's] business." *Dalheim v. KDFW-TV*, 918 F. 2d 1220, 1230 (5th Cir. 1990). He was not "working on a production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). He was assisting

in running the business. By his own admission, the second element of the administrative exemption is established as a matter of law.

### 2.  Houlihan exercised discretion and independent judgment with respect to matters of significance.

Finally, to qualify for the administrative exemption, an employee's primary duty "must include the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.202(a). The exercise of discretion and independent judgment "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." *Id.* "The term 'matters of significance' refers to the level of importance or consequence of the work performed." *Id.* Houlihan's testimony proves this element as a matter of law. Throughout his shift, Houlihan used his experience and judgment to control the distribution of sand to all of the job sites in his geographic district. He did this by monitoring all of the "moving parts" and deciding, based on his review of them, where to send the trucks, and when. He diverted trucks from one job site or another as necessary, and he did not have to get the approval of anyone else to do so. He was responsible for ensuring that the immediate needs of FTSI's customers were met at each job site, each day. In so doing, he had and exercised "authority to make an independent choice, free from immediate direction or supervision." 29 C.F.R. § 541.202(c).

Based on his own testimony, Houlihan had the authority to implement management policies and operating practices; he carried out major assignments in conducting FTSI's business operations; and the work he performed affected FTSI's business operations to a substantial degree, three of the several non-exhaustive factors to be considered in determining whether an employee exercised "discretion and independent judgment." 29 C.F.R. § 541.202(b). Houlihan had substantial control – "complete responsibility" – over a significant aspect of the day-to-day

operation of FTSI's fracing services business. Houlihan routinely exercised his discretion and judgment. The third element is satisfied, and the Court should therefore determine that the administrative exemption applied as a matter of law, and grant the Motion.

## D.     If FTSI is Found to have Misclassified Houlihan, the Fluctuating Workweek Method Applies

For the reasons set forth above, FTSI contends that it properly classified Houlihan as an exempt employee and therefore that he is not entitled to overtime pay for hours worked in excess of forty hours per week. However, if and to the extent the Court determines after the trial of this matter that Houlihan *was* misclassified, the fluctuating workweek method applies as a matter of law for purposes of determining any overtime payment due to him.

The FLSA provides that a non-exempt employee may not be employed for a workweek longer than 40 hours "unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The FLSA, however, does not define the term 'regular rate' for purposes of the statute. The Supreme Court, in interpreting this section of the FLSA, first announced and approved of the fluctuating workweek method of calculating an employee's "regular rate" in *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 580 (1972). It is now codified in the Department of Labor's regulations as one of the various methods available to an employer for calculating overtime compensation. The relevant regulation provides:

> An employee employed on a salary basis may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many. Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the

amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay. *Since the salary in such a situation is intended to compensate the employee at straight time rates for whatever hours are worked in the workweek, the regular rate of the employee will vary from week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary to obtain the applicable hourly rate for the week. Payment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement.*

29 C.F.R. § 778.114(a) (emphasis added).

That is, for the fluctuating workweek method to apply, (1) the employee's hours must fluctuate from week to week; (2) the employee must receive a fixed salary that does not vary with the number of hours worked during the week; (3) the fixed amount must be sufficient to provide compensation every week at a regular rate that is at least equal to the minimum wage; and (4) the employer and employee must share a clear mutual understanding that the employer will pay that fixed salary regardless of the number of hours worked. 29 C.F.R. § 778.114(a). If those four conditions are met, then overtime pay is calculated by dividing the fixed salary by the number of hours actually worked in a given week to determine the "regular rate," and the employer is liable for half-time overtime for hours in excess of 40. *Id.* § 778.114(b).

All of the requisites are met. Houlihan's hours *did* fluctuate from week to week, as he alleges in the Complaint. [Complaint ¶ 6.] He *did* receive a fixed salary every week that did not vary with the number of hours worked, and that salary was sufficient to provide a "regular rate" of at least the minimum wage every week no matter how many hours he worked.[53]   Finally,

---

[53] That is, if his salary was $55,000 a year, his weekly salary was $1,057.69. Even in weeks in which he worked 60 hours, the maximum he has alleged [Complaint ¶ 6], his "regular rate" was $17.62 per hour, well above the prevailing minimum wage.

Houlihan testified unequivocally that he understood his salary compensated him for all hours worked:

**Q:**  . . . [Y]ou were always paid a salary?

**A:**  Yes, sir.

**Q:**  And it didn't matter how many hours you worked, you were paid the same salary?

**A:**  That is correct.

\* \* \*

**Q:**  You understood it didn't matter how many hours, however many you worked, you were going to get paid that salary?

**A:**  Yes, sir.[54]

It ***does not matter*** that Houlihan's weekly hours did not fluctuate above and below 40. "[N]either existing authority nor the language of 29 C.F.R. § 778.114(a) supports [the] argument that an employee's hours [must] fluctuate above and below 40 for the fluctuating workweek method of computing overtime compensation to apply." *Mitchell v. Abercrombie & Fitch Co.*, 428 F. Supp. 2d 725, 735 (S.D. Ohio 2006), *aff'd*, 225 Fed. App'x 362 (6th Cir. 2007) (collecting cases). *See, e.g.*, *Flood v. New Hanover County*, 125 F.3d 249 (4th Cir. 1997) (employees worked fixed, alternating workweeks that ranged between 48 and 72 hours; court upheld the fluctuating workweek method as FLSA compliant and cited a DOL letter ruling approving the FWW method where an employee worked alternating, fixed weeks of 43 and 51 hours); *Condo v. Sysco Corp.*, 1 F.3d 599, 601-602 (7th Cir. 1993); *Ramos v. Telgian Corp.*, 176 F. Supp. 3d 181, 195-196 (E.D.N.Y. 2016); *Garcia v. Yachting Promotions, Inc.*, No. 15-20776-Civ-Scola, 2015 WL 12533144, \*2 (S.D. Fla. Dec. 8, 2015) (citing *Mitchell*); *Evans v. Lowe's Home Centers, Inc.*, No. 3:CV-03-0438, 2006 WL 1371073, \*3 (M.D. Pa. May 18, 2006).

---

[54] App. 4-5 (Houlihan 29:19 – 30:7).

Thus, while FTSI is steadfast in its contention that it properly classified Houlihan as exempt under the "administrative exemption," to the extent the Court determines otherwise after a trial on the merits, FTSI is entitled now to partial summary judgment that any overtime owed to Houlihan must be calculated pursuant to the fluctuating workweek method – that is, by determining his "regular rate" for a given week by dividing the number of hours worked that week into his fixed salary, and paying him half-time overtime for each hour above 40 in that week.

## VI.      CONCLUSION

For the foregoing reasons, FTSI respectfully requests that the Court grant the Motion; sever Houlihan's claims into a separate action; enter a take-nothing judgment in favor of FTSI on each of Houlihan's claims, causes of action, and requests for relief, or, in the alternative, an order determining that *if* FTSI is determined to have misclassified Houlihan, then the fluctuating workweek method of determining overtime compensation applies; and grant all other relief, general or special, at law or in equity, to which FTSI may be justly entitled.

Respectfully submitted,

John B. Brown
Texas Bar No. 00793412
john.brown@ogletreedeakins.com
John M. Barcus
Texas Bar No. 24036185
john.barcus@ogletreedeakins.com
**OGLETREE, DEAKINS, NASH,**
**SMOAK & STEWART, P.C.**
8117 Preston Road, Suite 500
Dallas, Texas 75225
Telephone: 214-987-3800
Facsimile: 214-987-3926

**ATTORNEYS FOR DEFENDANT**
**FTS INTERNATIONAL SERVICES, LLC**

## CERTIFICATE OF SERVICE

This is to certify that on October 20, 2017 a true and correct copy of the foregoing document was served on Plaintiff's attorney of record by ECF notification:

Robert E. Goodman, Jr.
KILGORE & KILGORE PLLC
3019 Carlisle Street
Dallas, Texas 75204
214-379-0831
214-379-0840 – Facsimile

John M. Barcus

31681589.1

# Ogletree
# Deakins

2017 OCT 20 PM 3:57

CLERK OF COURT

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

*Attorneys at Law*

Preston Commons West
8117 Preston Road, Suite 500
Dallas, TX 75225
Telephone: 214.987.3800
Facsimile: 214.987.3927
www.ogletreedeakins.com

John M. Barcus
214.313.2902
john.barcus@ogletreedeakins.com

October 20, 2017

***Via Hand Delivery***
Karen Mitchell, U.S. District Clerk
Northern District of Texas
Fort Worth Division
501 W. 10th Street, Suite 310
Fort Worth, TX 76102

      *Re:*    Civil Action No. 4:17-cv-170-A; *Stephen Jason Houlihan and John Sample v. FTS International Services, LLC.*; In the U.S. District Court for the Northern District of Texas, Fort Worth Division

Dear Ms. Mitchell:

      Enclosed are the original and two copies of Defendant's (1) Motion for Summary Judgment and Brief in Support and (2) Appendix in Support of Motion for Summary Judgment. The original Motion is stapled, and the original Appendix is spiral-bound and tabbed. Each bears my original signature. Please file the documents in the ordinary course, deliver the stapled Motion and spiral-bound Appendix to Judge McBryde, and return a file-marked copy to our courier. I have also enclosed two copies of this letter. In addition to retaining the letter for your file, will you kindly place your "filed" or "received" stamp on each copy, deliver one to Judge McBryde with the original instruments, and return one of the copies to our courier?

      Versions of these documents were filed yesterday (doc. 24 and 25), but were unfiled by order of Judge McBryde this morning. My understanding, based on conversations my paralegal Josh Ellis had earlier today with our courier and with Kate in Judge McBryde's chambers, is that although the file-marked originals and one copy of each were retained by the district clerk upon delivery by our courier yesterday, the file-marked copies, rather than the stapled Motion and the spiral-bound Appendix, were delivered to chambers, thus precipitating this morning's order. Kate asked that we resubmit everything for filing today. I have therefore marked today's date on the certificates of service for each instrument.

Atlanta ▪ Austin ▪ Berlin (Germany) ▪ Birmingham ▪ Boston ▪ Charleston ▪ Charlotte ▪ Chicago ▪ Cleveland ▪ Columbia ▪ Dallas ▪ Denver ▪ Detroit Metro ▪ Greenville
Houston ▪ Indianapolis ▪ Jackson ▪ Kansas City ▪ Las Vegas ▪ London (England) ▪ Los Angeles ▪ Memphis ▪ Mexico City (Mexico) ▪ Miami ▪ Milwaukee ▪ Minneapolis
Morristown ▪ Nashville ▪ New Orleans ▪ New York City ▪ Oklahoma City ▪ Orange County ▪ Paris (France) ▪ Philadelphia ▪ Phoenix ▪ Pittsburgh ▪ Portland ▪ Raleigh ▪ Richmond
St. Louis ▪ St. Thomas ▪ Sacramento ▪ San Antonio ▪ San Diego ▪ San Francisco ▪ Seattle ▪ Stamford ▪ Tampa ▪ Toronto (Canada) ▪ Torrance ▪ Tucson ▪ Washington

Kathryn Wheeler Distribution
October 20, 2017
Page 2

**Ogletree Deakins**

Thank you for your assistance. Should you have questions, please contact me.

Very truly yours,

John M. Barcus

Enclosures

cc: Hon. John H. McBryde (w/encl. – *via hand delivery*)
Robert E. Goodman, Jr. (w/encl. – *via email*)

31701156.1